## STATE OF CONNECTICUT
### vs.
## MARTIN ROTTMAN

Superior Court          Fairfield County          File #8785

MEMORANDUM FILED NOVEMBER 15, 1938.

Lorin W. Willis, State's Attorney, of Bridgeport; Otto J. Saur, Assistant State's Attorney, of Bridgeport, for the State.

Lawrence Finkelstone, of Bridgeport, for the Defendant.

McEVOY, J. This accused is informed against in the language of section 6244 of the General Statutes, Revision of 1930. The heading of this section is "Obscene literature and pictures." It provides, substantially, that any person who shall sell, or have in his possession with intent to sell, any book, pamphlet, or paper containing obscene, indecent or impure language, printed or written matter of like character, shall be punished.

Two exceptions are made. The first is that if it appears that the possession is had with intent to aid in the suppression; and the second is if the possession is had for the purpose of enforcing the provisions of the section, then there shall be no offense.

This accused does not claim that he is within either exception. He admits that he had these exhibits for sale. He denies that their contents violate the law.

Obscenity was indictable at common law, on the ground that what tended to corrupt society amounted to a breach of the peace. The word obscenity cannot be said to be a technical term of the law, and is not susceptible of exact definition in its judicial uses, so it has been defined in a general sense as meaning offensive to morality or chastity, indecent, nasty. While it is not possible to define obscenity with any degree of practical certainty, the test ordinarily followed by the courts in determining whether a particular publication or other thing is obscene within the meaning of the statute is whether the tendency of the matter charged as obscene is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication or other article charged as being obscene may fall. 8 R.C.L. Criminal Law §388.

The rule that a guilty intent is not an essential element of a crime that is positively prohibited by statute applies to the offense of obscenity. To constitute the crime there is no necessity for the existence of any specific intent or motive, and, in fact, although the motive and intent are of the best, this is no defense. There are only two questions in a prosecution for obscenity: (1) Is the article, publication, picture, or whatever may be the basis for the prosecution, obscene? (2) Did the defendant sell the obscene article which the statute prohibited?

The law does not permit a man to do evil that good may come of it; hence the motive of a person who is charged with obscenity does not amount to a defense. Accordingly, the fact that the authors of a particular work of art or literature did not have an impure thought, but the highest and best purpose, and that the alleged obscenity was merely an incidental element, will not amount to a defense if the work is obscene within the meaning of the statute. 8 R.C.L. Criminal Law §339.

A proper test of obscenity in a painting or statue has been held to be whether the motive of the painting or statue, so to speak, as indicated by it, is pure or impure, whether it is naturally calculated to incite in the spectator impure imaginations, and whether the other incidents and qualities, however attractive, are merely accessory to this as the primary or main

purpose of the representation.   8 R.C.L. Criminal Law §341.

Acceptance in other places than our own of a publication is of no great importance to us, unless the moral standard of those other countries is a replica of our own.   Charm of language, subtlety of thought, faultless style, even distinction of authorship, may all have their lure for the library critic, yet these qualities may all be present and the book be unfit for dissemination to the reading public.

Aside from the purely spiritual and idealistic viewpoint, the enforcement of this section is of great materialistic concern to our government.   The future of a nation depends upon its youth.   Our more enlightened conception of the need of protective measures to preserve our youth is reflected in the great progress that has taken place in recent years in the enactment of laws for the protection of the health of our women and children to save them from exploitation by the unscrupulous employer, and even sometimes, though rarely, the unscrupulous parent, in order that the child may become a healthy and useful citizen, and the woman preserved for motherhood.   We have the compulsory education laws; we have the laws prohibiting child labor, and when children are permitted by law to work we limit their hours of employment; we have the laws limiting the hours women may toil, and others prohibiting them from working in factories during the nighttime; we have laws insuring proper sanitary conditions under which they may be employed, the Widows' Pension Law and many others, here unnecessary to enumerate, of the same purport.

And while their enactment was actuated largely by our enlightened conceptions of social justice and motives altruistic, yet these laws also exist because the fostering of the health of women and children is one of grave governmental concern. Just as it is of national concern and interest to protect their health, it is equally important to protect our youth against the corruption of their morals, so that we may do everything within governmental power to afford them physical, mental, and moral virility, and not have their development arrested in these respects during the formative period.   It is a national duty to prevent the moral or physical weakening of the family —"the nursery of mankind."   History warns us that in the wake of a moral deterioration comes physical deterioration and national destruction.   Hence our interest in the strict enforcement of all laws to prevent the publication and distribution of corrupt literature.   As it is the duty of our law-enforcing

branches of government to enforce with vigor these laws, so it is the correlative function of the courts not to narrow the law's application by accepting tests restrictive of the common-ly accepted meaning of the words. *People vs. Seltzer,* 122 Misc. 329, 334, 203 N.Y.S. 809, 813.

These publications plainly, and in my judgment intention-ally, cater to a prurient taste, which it is the thinly disguised object of the authors to incite; and associated, as they are, in the publications where they appear, with other writings of a similar nature, they are capable of doing incalculable harm; all the more so because they are intended to circulate among and attract the young, to whom some of these publications are particularly addressed. It would seem to me to be clear that these publications are of the obscene, lewd, and lascivious char-acter which it was the object of our Legislature by the legisla-tion in question to suppress. The standard is not the publica-tions to which reference has been made in argument, some of which may or may not be just as bad as these, but some of which do pass muster with some people. The test is the ten-dency to deprave and corrupt the minds of those who are open to such influence, into whose hands these publications or some of them, may come.

Judge Thayer answered the question as follows: "If the effect of the pamphlet and papers as a whole would be to deprave and corrupt the minds of those into whose hands they might come whose minds are open to such influences, or to ex-cite lustful or sensual desires, then the pamphlets and circu-lars should be found to be obscene and lewd, whether such effect on the minds of the readers is produced by single pas-sages or portions of the pamphlets and circulars, or by many passages or portions." *U.S. vs. Clark,* 38 Fed. 732, 736. *See also, Rosen vs. U.S.,* 161 U.S. 29; *MacFadden vs. U.S.,* 165 Fed. 51.

Each case must be decided upon its own facts in accordance with the law

An examination of the twenty-one exhibits now in evidence shows that they clearly come within the purview of provisions of section 6244 of the General Statutes, Revision of 1930. They not only contain "obscene, indecent or impure language (and) . . . picture(s), print(s), drawing(s), figure(s) . . . of like character", but, a careful examination of these exhibits fails to disclose any language which is not of like classification.

In all of these exhibits there is no language which in any way tends to enlighten or to elevate, but, on the contrary, most of the language in the exhibits is of the most degrading character.

Whatever the claim may be as to the generality of desire to read such publications, yet our Legislature has seen fit to declare it to be the law that any one who sells any paper "containing obscene, indecent or impure language" shall be subject to a severe penalty.

The enactment of this section was one step in a design to prevent our society from dissolving itself in indecency; to stay the degeneration of private and public morals; to arrest the spread of hideous diseases, which eat out the marrow of the race; and to restrain revolting realism, which breeds a public taste for filth.

Upon all of the evidence, and the law, this accused is found guilty.